# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

ALPHONCY DANGERFIELD,

               Plaintiff,

v.

JOLINDA WATERMAN, JAMES LABELLE,
SONYA ANDERSON, KELLI WILLARD WEST,
and CYNTHIA GRIFFIN,

               Defendants.

ORDER

17-cv-230-jdp

      Plaintiff Alphoncy Dangerfield, a prisoner at Oshkosh Correctional Institution, alleges that when he was housed at Wisconsin Secure Program Facility (WSPF), prison officials failed to properly treat his diabetes and hyperglycemia and provide him with a yoga mat to perform physician-ordered yoga.

      All of the defendants except Cynthia Griffin are represented by the state, and they have filed a motion for summary judgment. Dkt. 51. I will refer to these defendants as the "state defendants." Defendant Griffin has filed her own motion for summary judgment. Dkt. 57. Those motions are fully briefed. Dangerfield has renewed his previously denied motion for recruitment of counsel. Dkt. 73.

      For reasons stated below, I will grant aspects of defendants' motions. But because I conclude that Dangerfield is unable to fully litigate his claims about his treatment for hyperglycemia, I will grant his motion for the court's assistance in recruiting him counsel.

UNDISPUTED FACTS

The following facts are drawn from the parties' summary judgment materials and Dangerfield's deposition, Dkt. 50, and are undisputed unless otherwise noted.

**A. Hyperglycemia**

During the events of this case, plaintiff Alphoncy Dangerfield was housed at Wisconsin Secure Program Facility (WSPF). At some point in the past, Dangerfield was diagnosed with type 2 diabetes. By the time of the events in question here, Dangerfield was not taking mediation to treat his diabetes because his glucose levels had been kept under control for about a year.

In late 2015, Dangerfield complained of shoulder pain. He received several types of treatment, including physical therapy and ice. On three occasions, Dangerfield met with defendant Cynthia Griffin, a nurse practitioner at Gundersen Boscobel Area Hospital and Clinics, by "telemedicine": Dangerfield stayed at WSPF and communicated to Griffin over video on a computer screen. After a January 15, 2016 telemedicine appointment, Griffin prescribed Dangerfield ibuprofen, ice packs, and muscle rub. Dangerfield continued to complain of pain and decreased range of motion. Two weeks later, Griffin referred him for an evaluation by an orthopedic surgeon.

On March 11, 2016, Dangerfield was taken off-site to Gundersen Hospital to be evaluated by orthopedic surgeon Dr. Edward Riley. Riley examined Dangerfield and diagnosed bilateral rotator cuff disease. He recommended rest, cross-training, and yoga. He also injected Dangerfield in both shoulders with a steroid treatment. Dangerfield says that Riley told him that his glucose levels would be monitored in prison. But Riley did not order that WSPF Health Services Unit (HSU) staff or Griffin monitor Dangerfield's blood-glucose levels.

2

By the end of March, Dangerfield started having blurry vision, needed to urinate every 30 minutes, had dry mouth, fatigue, and joint and muscle pain, all of which are symptoms associated with hyperglycemia. Although he submitted a series of health service requests and medication requests about his shoulder pain and other medical issues, he did not submit a request about his hyperglycemia symptoms until early May 2016. Dangerfield says that two or three times before he filed a request, he spoke with defendant Nurse Sonya Anderson at his cell about his symptoms, but she responded only by saying that he was scheduled to see a provider at some point in the future. Anderson says that she does not informally meet with inmates at their cells, and that Dangerfield did not report his hyperglycemia symptoms to her.

When Dangerfield filed his formal health services request about his hyperglycemia symptoms in early May, Nurse Bethel (who is no longer a defendant) met with him, placed him on the list to see an advanced care provider, and told him to submit a urine sample. That sample resulted in a reading of "1000." Dkt. 52-1, at 99. No scale of measurement was included on that document, but I take the parties to agree that it was an exceptionally high reading.

Griffin saw Dangerfield on May 17, 2016, by telemedicine. Dangerfield mentioned his hyperglycemia symptoms. Griffin checked Dangerfield's blood glucose via finger poke, which showed that his blood glucose was "578," a "very high" result. Griffin gave Dangerfield five units of insulin and rechecked his blood sugar twice. One of the recheck results was too high to be measured on the meter. Griffin recommended Dangerfield be sent to the emergency room, and he was. After speaking with the emergency room doctor, Griffin prescribed Dangerfield medication and insulin, and ordered that his blood glucose be measured four times a day. She also discontinued his further shoulder injections.

In June 2016, Dangerfield filed an inmate grievance, stating that WSPF staff had neglected his hyperglycemia symptoms until he was taken to the ER. After speaking to defendant Health Services Manager Jolinda Waterman, the complaint examiner recommended dismissing the grievance. Defendant James LaBelle, the regional nursing coordinator, dismissed the grievance.

## B. Yoga mat

As the DOC's Religious Practices Coordinator, defendant Kelli Willard West regularly reviews and recommends revisions to policies and procedures as needed to address new information and legal precedent on inmate religious accommodations.

Dangerfield requested a mat to perform the yoga recommended by Dr. Riley. Medical staff reviewed Dangerfield's request and denied it. Dangerfield says that he later requested the mat through the religious-property channel, but it was denied by a chaplain. (Dangerfield alleged that only inmates in the "Eastern Religion" group were allowed yoga mats, but neither side provides proposed findings clarifying that issue.) Willard West says that she did not review any such request by Dangerfield. Dangerfield concedes that he has no personal knowledge that Willard West was involved in the denial. Within two or three months, the property policies changed and Dangerfield was allowed to have a mat.

## ANALYSIS

### A. Hyperglycemia

Defendants have combined to file two motions for summary judgment on Dangerfield's Eighth Amendment and Wisconsin-law negligence claims.

4

The Eighth Amendment prohibits prison officials from acting with deliberate indifference to prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). A medical need is serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371–73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm. *Farmer*, 511 U.S. at 847. To be considered "deliberately indifferent," an official must know of and disregard "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

Under Wisconsin law, all claims of negligence require the same four elements: "(1) a breach of (2) a duty owed (3) that results in (4) an injury or injuries, or damages." *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860.

Dangerfield alleges that defendants' failure to follow Riley's orders to check his blood glucose led to him suffering a host of symptoms for two months, that the failure to maintain a lower glucose level led to more chronic hyperglycemia, and that because he now suffers from hyperglycemia he cannot receive more steroid injections, which has left him with shoulder pain. At this point I will consider all of these problems to be serious medical needs.

5

There are certain aspects of Dangerfield's medical claims that can be dismissed. For instance, given the care that Dangerfield otherwise received from defendant Griffin—she prescribed him pain medication, ice, referred him to the surgeon, and then sent him to the ER—no reasonable jury could conclude that she acted with deliberate indifference to Dangerfield's medical needs. Dangerfield also brings claims against defendant LaBelle, but his involvement in these events are limited to reviewing one of Dangerfield's grievances. Dangerfield cannot show that LaBelle harmed him, so I will dismiss LaBelle from the case. *See George v. Smith*, 507 F.3d at 609–10 ("A guard who stands and watches while another guard beats a prisoner violates the Constitution; a guard who rejects an administrative complaint about a completed act of misconduct does not.").

But otherwise I am not convinced that Eighth Amendment or negligence claims against defendants are untenable, because Dangerfield has not provided enough information to tell who the proper defendants for his claims are. The parties' submissions raise a strong inference that *someone* should have caught the risk Dangerfield faced from the steroid injections.

Defendants contend that they could not have violated Dangerfield's rights because Dr. Riley did not specifically order blood-glucose testing. But discharge instructions that Dangerfield received after his emergency-room visit state that steroids can cause hyperglycemia. Dkt. 53-1. Presumably defendants knew or should have known about the risk facing Dangerfield as a diabetic, regardless of Riley's instructions. Perhaps HSU staff should have been monitoring his blood glucose all along. Or perhaps Dangerfield has not named the correct defendants. But these questions involve complex medical issues regarding the standard of care for a diabetic patient that Dangerfield is not equipped to address on his own. Nor does it appear that he is capable of performing the discovery necessary to hash out each respective

medical official's duty to him as part of the complex web of providers he encountered. Following completion of the summary judgment briefing, Dangerfield renewed his motion for the court's assistance in recruiting him counsel. Dkt. 73. Because I conclude that the assistance of counsel is likely necessary to address these issues, I will grant Dangerfield's motion, stay the case, and attempt to locate counsel for him.

If I find counsel willing to represent Dangerfield, I will advise the parties of that fact. Soon thereafter, a status conference will be held to set a new schedule. I anticipate that it will involve reopening discovery. Dangerfield should know that because of the large number of requests for counsel that the court receives, the search for counsel may take several months and there is no guarantee that the court will find counsel willing to represent him.

B. **Yoga mat**

Counsel is not needed to resolve Dangerfield's Eighth Amendment claim against defendant Willard West for ignoring his complaints about being denied a yoga mat even though Dr. Riley recommended he perform yoga. Dangerfield does not provide any evidence showing that Willard West was personally involved in this deprivation. It is undisputed that Dangerfield was initially denied a mat by medical staff, and later by a chaplain. Willard West says that she did not receive a religious-property request from Dangerfield. Dangerfield does not address this issue in his summary judgment opposition. At his deposition, he stated that he sent Willard West a letter about the mat, *see* Dkt. 50, at 27, but he does not know whether Willard West received it. In any event, Dangerfield's only claim against Willard West is a medical-care claim, not a religious-freedom claim. Because Dangerfield presents no evidence suggesting that Willard West—a religious-services official—had any control over the provision of a mat for medical purposes or that she could countermand decisions made by medical

7

personnel, he cannot show that she was deliberately indifferent to his medical needs. So I will grant defendants' motion for summary judgment on this claim and dismiss Willard West from the case.

**C. Motion to stay**

The state defendants have filed a motion to stay the current schedule pending resolution of the summary judgment motions. I will deny that motion as moot given the stay I am granting to recruit counsel.

ORDER

IT IS ORDERED that:

1. The motion for summary judgment filed by defendants Jolinda Waterman, James LaBelle, Sonya Anderson, and Kelli Willard West, Dkt. 51, is GRANTED IN PART.

2. The motion for summary judgment filed by defendant Cynthia Griffin, Dkt. 57, is GRANTED IN PART.

3. Defendants LaBelle and Willard West are DISMISSED from the case.

4. Plaintiff Alphoncy Dangerfield's motion for the court's assistance in recruiting him counsel, Dkt. 43, is GRANTED. All remaining deadlines are STRUCK and the case is STAYED pending recruitment of counsel for Dangerfield.

5. Defendants' motion to stay the schedule, Dkt. 77, is DENIED as moot.

Entered May 22, 2019.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge